We'll be hearing three cases today, and we will start with Hraeus Medical v. Esschem. Mr. Wolfe? Thank you, Your Honor. May it please the Court, Matthew Wolfe for Hraeus. I'll be reserving four minutes. To this day, Esschem is making batches of bone cement based on Hraeus' trade secrets. The first question presented is one of statutory construction, and by it, we believe the statute properly construed would allow us to enjoin this repeated use of our trade secrets on an ongoing basis and to seek recompense for those uses subsequent to September 2011. The analysis starts with Section 5302, which plainly suggests that misappropriation comes in two flavors, two different kinds. There's the initial theft, which some have analogized to a breach of contract, but then... It seems like Judge Ruff was considering your knowledge of Biomed's misappropriation and perhaps came to the conclusion that because of that knowledge, he should have known of Esschem's misappropriation and on that basis made a decision as to the statute of limitations, because your knowledge was more than three years before the statutory period. Yes, Your Honor, and that gets to the second ground, the second independent ground of the appeal, and I'm happy to answer your question directly. I was starting with the first ground. As to the second ground, it is axiomatic that Sienter is part of misappropriation. Do you have any case whatsoever that applies the single accrual in this type of action? Yes, Your Honor. Mary Anaconda, for example, the underwater storage case, both applied single accrual or independent separate continuous accrual, it's used various names, but each of those applies the separate accrual doctrine, and really I think underwater storage talks to the policy best when it said that the policy behind the doctrine is clear. You cannot baptize, use the words baptize, subsequent misappropriations merely because there was an earlier misappropriation outside the limitations period. And so, yes, there are multiple cases, as we cited in our brief. But with trade secrets? Yes, Your Honor. Yes, underwater storage. How about Webb Diet? Webb Diet? Webb Diet was a court of common pleas case that made the same mistake the district court made in this case, which was to take the comment to the model uniform trade secret acts applying to the second sentence of the provision and importing it into Pennsylvania, even though the second sentence of the statute itself wasn't imported into Pennsylvania. That's the only case that's in Pennsylvania that's a Pennsylvania case, though. Is that correct? It is a court of common pleas case, Your Honor. That's the only Pennsylvania case? That's correct. That's a state court case? That's correct, Your Honor. Well, that's Pennsylvania law then, right? Not at all, Your Honor. I mean, first of all, it is black letter law that this court should not give more credit to or give more significance to a Pennsylvania state case than the Pennsylvania appellate courts would themselves give. So we don't have a Pennsylvania appellate decision. We don't have a Pennsylvania Supreme Court decision. What we do have is a very carefully thought out eastern district of Pennsylvania case, Anaconda from 1980, which explains the common law, and then we have the model and the common law being the separate disclosure and use components of misappropriation. But that language appears in the Uniform Trade Secrets Act as well, and Anaconda, of course, predates the Pennsylvania statute. So talk to us about under Pennsylvania law. We have Pennsylvania's canons of statutory construction. Yes, Your Honor. Tell us in pretty mandatory terms that we're to look to the commentary that accompanies uniform acts that are adopted in Section 3 of the legislation that enacted the Pennsylvania Uniform Trade Secrets Act. Why shouldn't we look to those comments to reach the same conclusion that Webb Dyett did? For two reasons. One is that the statute itself says when there's a conflict between the statutory language and the commentary language, one looks to the statute, not the commentary. How is it a conflict? There's an omission, but there's ambiguity around that omission. Your Honor, respectfully, I don't believe it's ambiguity. I believe there was simply a mistake. There was a model uniform act with two sentences. There was commentary that talked about both sentences. The Pennsylvania legislature decided only to adopt the first sentence. When the commentary was imported from the model act to the Pennsylvania act, they imported the commentary that applied to both the first and the second sentence, rather than just the first sentence. That's a ministerial error that if it were to be given weight would completely override. Obviously, the Pennsylvania legislature chose not to adopt the second sentence. Go ahead, Your Honor. You haven't pointed us to any legislative history, for example, or statements of the legislature in the process of enacting this, perhaps in the public law itself that might indicate what significance that modification has relative to the Uniform Trade Secrets Act. We didn't find any substantive analysis, Your Honor, but recall that the common law was consistent with our position here. So we have the common law that fines for separate accrual. We then have the Model Uniform Act that would undermine that, that would chop that off, and Pennsylvania removed, the legislature removed the second sentence. And now we're in a world where we're being told because of commentary language imported from a broader, not adopted model language, we should ignore the policy of the common law. We should ignore the implications at least. Your Honor is correct that there was no, you know, substantive legislative history, but we should ignore the implication of chopping that second sentence off because of what appears to be a simple administrative error in importing whole cloth, the commentary, rather than the commentary on a sentence-by-sentence basis. Was it a conscious decision to remove that sentence? Excuse me, Your Honor? It wasn't a conscious decision? You say it was an administrative error? It would have had to be a conscious decision because if, as most states did, they simply wanted to adopt the legislature, adopt the Model Act, all you do is take the Model Act, put it in. So someone that the legislature removed, it took an act to remove the second sentence. Well, generally, that's typical legislature conduct. Anything is the least bit iffy, they throw it into the courts. But in this situation, how do you deal with the single accrual rate rule and the discovery rule here? Because there would be no end of the case if you have they make a discovery rule, which is like forever then. Well, Your Honor, as we point out in various hypotheticals in a brief, I think that the district court in Eskim is incorrect in that regard. Once we learn of the misconduct or should know under the discovery rule, the three-year window starts for any given misconduct. So it goes on forever in a case like this as far as you're concerned, right? You have no statute of limitations. Every time they violate your trade secret, there's another three years. So there's no end of it. Your Honor, I have that image of the Jetsons with the conveyor belt, with people dropping off one end when people come to the front end. If we wait, if we sit on our rights, every three years, we lose the ability to gain recompense. So it's not like there isn't a policy implication to us sitting on our rights. As time passes, we lose the ability to get all the oats of it. And I would quote underwater storage again. This is powerful. When they talk about Your Honor's exact point, the court said their gain, meaning the defendant in that case is ill-gotten, and the passage of time should not serve to cleanse their hands. So those that have adopted the separate accrual rule have thought precisely of the policy Your Honor has suggested. And what we lose by waiting is the ability to get money for three-year-old or older injury. But once you steal a trade secret, you don't get to use it, and you don't get to baptize it by using it once and then waiting. Well, yeah, but the theory of the statute of limitations is that all things good and bad have to come to an end. We have to have definitive guideposts and guide marks. And why wasn't the district court correct then? You had too many red flags telling you that your trademark, your trade secrets were being misappropriated here. Your Honor, if you believe that there's not a separate – I mean, there were so many things that happened here. Wouldn't anyone that was half awake know that, hey, there's something amiss here? Your Honor, you're absolutely right, and this is where we have to turn back to the language of the statute, which had said was it discovered or by the exercise of reasonable diligence should have been discovered. This case presents an interesting fact pattern because we were suspicious, and we undertook that diligent effort. We filed the two 1782 actions. And Gleason, a case cited by Eskim, says what might he have known by the use of means of information within his reach with the vigilance the law requires of him. We vigilantly set out. You set out the date of December 16, 2011. Is that right, the date of Daniel Smith's deposition? That's when we – When you first realized that Eskim was using your intellectual property? That's when we first became confident that there was a cause of action. We were suspicious. Be clear. We were absolutely suspicious. What created the confidence as opposed to suspicion? Because what that deposition revealed is that not once or twice or sporadically, but that Biomet's folks sat in the same room with Eskim's folks during development and collectively worked on the formulation. And so that's when you say, wait a second, if Biomet knows our trade secrets and they're sitting in the same room with Eskim when Eskim's developing, that's big red flag. Yes, Your Honor. But that's all you learned from the deposition that gave you enough to move forward on Sienter. I mean, that's consistent with what you said in your brief about the deposition having significance because Smith had acknowledged that he and his colleague were direct participants in the development workout and that that work led directly to the two polymers at issue. Why isn't that exact same information available in the three e-mail chains that your colleague on the other side of the aisle has put forward that seem to indicate through those e-mails that those same two Biomet employees were directly involved with manufacture on a regular basis and that that was what was leading to the development of those two polymers? Let me give you a general and a specific answer. I know I'm in my time, but let me, if I may give you the general answer. I just want to make it clear. This was on summary judgment in what Gleason has called an intensely fact-bound inquiry. And recall that in just a few months earlier, in July of 2011, both the court and the parties all agreed as of that point still, Eskim could have been an innocent bystander to all this. So that's the general level. The specific answer to your question, Your Honor, is that those e-mails show that Biomet was feeding information to Eskim. It didn't, on a sporadic basis, it didn't show that Eskim, though, was sitting down as part of the development process with them. In other words, the evidence, the e-mails tend to show that Biomet was saying do this, this, and this, and Eskim was saying, oh, okay. Whereas the Dan Smith deposition suggested they worked together. And it just doesn't matter of common sense. If you're working together in the same room consistently on development, that raises, I mean, it's all in a continuum. I'm not suggesting there's a bright line here, Your Honor. I'm not trying to oversimplify this. Did you have direct knowledge before December the 16th that Eskim was in fact using your intellectual property? No, we had no knowledge of that. In fact, we didn't have knowledge of that on December 2011 that Eskim was using our intellectual property. Correct, Your Honor. You mean that it was intentionally with knowledge or that they were using it? I'm sorry. I might have misunderstood you. I say using. Yes. We believe that they were using our intellectual property. But as Judge Roof said, and as all the parties in the courtroom agreed at the time, they could have innocently been using that. And, of course, misappropriation requires scienter. So that was the hurdle that needed to be crossed. That was the line until we had scienter. And this goes to the Merck case and others. It wasn't until December the 16th that you realized that Eskim was in cahoots with Miamet in the use of your property. That that was the most likely. That's your position. That's the most likely scenario. Correct. Email chains did not alert you or give you significant information that, in fact, they were working together and that they were misusing, Eskim was, in fact, misusing your property. Your Honor, we had suspicions, and that's why we filed the 1782 action. You suspected, but that's not enough for us. Benack, can I just quote Benack last thing? The storm warnings case that Eskim cited states, once defendants established storm warnings in pressing their affirmative defense, the burden shifts to the plaintiffs to show that they exercised reasonable due diligence and yet were unable to discover their injuries. And that's exactly what we did with filing the 1782 actions, filing the motions to compel. I'm still not clear what specifically in the testimony is giving more information about that collaboration than in the emails. And we have the emails. I realize that the transcript of testimony is sealed, but can you point us to even line numbers without discussing the content that have something different than what you could glean from the emails that put you on storm notice?  May I do that on rebuttal, Your Honor, because then I can pull up the actual sites? That's fine. Thank you, Your Honor. I believe I'm well ahead of time. Thank you, Your Honor. Mr. Harris? Thank you, Your Honor. Good morning, counsel. May it please the Court, we have a case here that involves irrefutable facts with clear statutory law. This circuit has addressed the discovery rule in cases over and over again and how it's narrowly construed, how it's narrowly interpreted, and how it's to be applied for the very reasons that counsel for Harais was being asked. Yet, Harais wants this court to make it the first case in history, anywhere in the United States, that applies the separate accrual rule. Well, don't we have to give some deference to the General Assembly's decision to not to adopt the specific single claim theory of approach here? What do we say to the General Assembly? This was a waste of time or what? No, no. They decided not to adopt something for some reason. That's true. What was the reason? The reason was they want to continue it? There's an explanation for that, Your Honor. In reality, Pennsylvania didn't adopt UTA until 2004. Twenty-four years earlier, a couple other states adopted UTA without the second sentence. And in a law review article from the Wake Forest Law Review from October of 1982, they actually addressed the rationale that the discovery rule in sentence one needs no further amplification at all. It's clear on its face. That may be the approach of the law review, but we have the Uniform Law Commission's own observations that seem to drive why a particular state might choose to enact or not enact that sentence, because they start out their comments saying there is presently a conflict of authority as to whether trade secret misappropriation is a continuing wrong. Doesn't that give us the backdrop against which Pennsylvania and North Carolina and Alabama opted not to include that particular sentence? No, Your Honor. There's two reasons to answer directly, Your Honor. Number one, with regard to the accrual, the event accrual system, that was based under the common law under, of all things, a statute of limitations stemming, was actually adopted in 1713 in colonial English. It was based, it's expressly in there, that it adopts the occurrence rule so that separate accruals can be taken into account. That changed, of course, in 2004 when PUTSA was installed. When you take a look at this, and the discovery rule was put into effect, clearly there was no legislative discussion in Pennsylvania. But the fact of the matter is, is there's been plenty of discussion in this circuit that when the discovery rule is applied, it's applied, as I mentioned, narrowly. It doesn't give the opportunity for what the panel was just asking counsel. This could go on forever. There's got to be finality. There's got to be a determination. This is a state court case. Don't we have to follow Pennsylvania law? Pennsylvania law, as far as I can see, always had the separate accrual rule, right, even before the statute. Pennsylvania rule before the statute had a common law, had an accrual rule. That's correct. But then PUTSA comes in with the discovery rule. And this court is clear. It's clear in the Miller-Fordes case. It's clear in the Gleason case that when a discovery rule is in effect, it follows to the letter a narrow interpretation of the discovery rule. And that's what this case is about. Right. The discovery issue, taking on the discovery rule would still be consistent with looking to the three-year period before filing. And it's just cut off at three years before filing. Or there's a laches defense available, which I take it was not part of this case. Your Honor, if you look at the Gleason case, if you look at the Miller versus Fordes case, they would be inconsistent. The opportunity of converting a discovery rule, a statutory discovery rule, into a damages limitation rule is not at all what was contemplated in PUTSA, not at all what was contemplated anywhere in any uniform trade secret act. What is the significance of the deletion of that sentence, then? The significance is that this state, just like North Carolina, is a state that rigidly enforces discovery rule cases, the discovery rule standard. And as mentioned, in Carolina, there's no need to take a bold, straightforward statutory discovery rule and say, oh, by the way, that means that there's no accrual. If Pennsylvania was to do that and other states were to do that, they face the possibility that other statutes and limitations based on the discovery rule that don't have a second sentence are all of a sudden thrown into controversy because of the absence of a second sentence. Well, how exactly would a single accrual rule nullify the statute of limitations? If they violated something and you don't file in time, they don't file in time, then they lose any damages for what the next statute for the next three years goes on and on, for each violation. So it doesn't really – your argument that it violates or nullifies the discovery rule doesn't make any sense because if you have a single accrual, if you don't file within the statute period, you lose that but the next one comes up for another three years. But, Your Honor, if that's the case and it's permitted to go on and on, as considered by this panel just a few minutes ago, the fact of the matter is there's no statute of limitations. It's eviscerated. Because, as Judge Cowen has pointed out, it cuts off those claims that predate the three-year period. So those are being cut off but consistent with what Eddie Becker, in a very thoughtful opinion, was recognizing as Pennsylvania's approach to trade secrets and misappropriation as adopting a property interest instead of a Holmesian confidential relationship approach to trade secrets, it seems to be treating each use as the violation, as the misappropriation. So why not have the injury accruing and the statute running from each use? Your Honor, as Judge Fuentes put it in the Miller case, the opportunity to have recurring events that spark a new damage period and just keep a discovery statute of limitations going and going, that becomes a damages limitation, not a statute of limitations that lends certainty and finality. When you consider that a discovery rule statute of limitations gives a plaintiff the benefit to begin with, the clock does not start running on the mere occurrence of a cause of action. You've got to discover it or discover it through, you know, reasonable diligence. There's already a benefit to the plaintiff. This circuit repeatedly holds that because of that, there's a narrow construction and that there are no recurring events that can start it over and over again. What's your take on Mr. Wolfe's position that it did not discover the misuse of its property until the deposition of Daniel Smith in December? Yeah, very interesting. We looked at APP 1703, the page with the four deposition pages, as this court did. There's not one mention anywhere or even a suggestion that all of a sudden, for the first time, ESKEMS reportedly realized, oh, my God, they had been given trade secrets. It doesn't appear there. And you know it doesn't appear there. I'm sorry? Did you mean Horaeus? You mentioned ESKEMS. No, Horaeus argues that ESKEMS revealed that they knew it was a trade secret that was being given to them. And interestingly, number one, there's about 30 to 33 different facts that occurred between 2005 and 2011, rather the crucial date. Amongst them, as the court notes, were e-mails, were representation, the 1782 action itself, the filing of the German complaint, the disputes that arose in 2005, the disputes that arose during the 1782 where documents are being funneled through and everything. All one has to look is at the complaint that was filed in September of 2014. Not once in that complaint is any reference made to a deposition from December of 2011 that supposedly there was a suggestion that BioMed knew it was getting that information. Number one, Horaeus didn't need to know that much of their account, that much of their complaint. I believe Mr. Wolf says suspicion of misuse or misappropriation is not sufficient. You should have actual knowledge. Horaeus is wrong. So don't you have a question of what we talk about here? Don't you have a question of fact? Can a court rule on summary judgment that they should have known? It was hidden between the eyes. But we have a jury question here as to whether or not a reasonable company would be aware that, hey, our trade secret is being misappropriated. We don't, Your Honor. The standard for filing a complaint is much more different than the standard for filing for summary judgment. I share the same thought because, as I understand it, questions of knowledge, when you realize that a significant event occurred, is typically a jury question. Your Honor, it would be if there was an issue of fact as to when Horaeus, in this case, knew about it. When Horaeus filed his complaint in 2014, they – Then there is an issue of fact if he says it occurred on such and such a date, December the 16th. I know you disagree. Of course. But we do know from the complaint that they claim that the information that they got from that deposition, you know, the crucial deposition, they claimed that that was revealed to them in 2008, in 2009. In fact, their expert witness, they have an expert witness who said a document proves that Eskam knew what they were doing was absolutely forbidden, that they were getting trade secrets, and that document was given. It's actually in there amongst the citations and everything. At APP 1768, 1604 to 1608, and 1621, that exact document that their expert claims told the whole story, including BioMed's knowledge, that was delivered a half year before the crucial date to Horaeus. So everything they've had, including the accusations in the complaint that BioMed was aware all along, it knew or should have known. Well, how could Eskam, rather, have known or should have known that they were getting trade secrets, but Horaeus not? I mean, it's the same information. It's the same standard. They accused them for nine years and didn't file until long after, long after the crucial date in 2011 came and went. Let's assume there is nothing in the record that's been developed that indicates some knowledge in the 2011 deposition that they didn't have earlier. And so we do need to look back to the question of the single accrual rule. What do we do with the public law? Section 4, when Pennsylvania is enacting the Pennsylvania Uniform Trade Secrets Act, it specifies as to misappropriations that are occurring prior to the act, that the act won't apply to misappropriations that occurred prior to the effective date. And then it goes on to say, including a continuing misappropriation that began prior to the effective date of this act and which continues to occur after the effective date of this act. When the legislature is making specific provisions for continuing misappropriations and using that term of art, doesn't that make clear that there is particular significance to their decision to omit that language in the second sentence of the act itself? Your Honor, I read that differently than the court does, actually. That's the straddling rule. And with regard to the Federal Trade Secret Act, they permitted straddling. If something was occurring before the act was adopted, you could sue on the basis of a continuing act afterwards. In the case of PUTSA, that's not the basis. If there was a violation that was occurring beforehand, you're not supposed to be able to straddle. And to me, my interpretation of that is, is that continuing acts aren't part of the rule. In fact, they're so not a part of the rule that if it was occurring before enactment of PUTSA, you should be suing under the common law. But that's not the case here with ESCAP. That's not at all what happened with ESCAP. To me, that confirms that you shouldn't be able to have separate accrual down the pike, the continuing tort logic. And that's not the way that this Court, the Third Circuit, even ignoring the Pennsylvania cases, which the Court raised and everything, that's not the way this Court, the Third Circuit, has treated a discovery basis statute of limitation. Your view is that you have to file a complaint within three years of your very first knowledge of the misappropriation. If you have knowledge or could exercise a reasonable diligence to determine knowledge, you have three years in which to file. You know the misappropriation may continue. The very first knowledge that you have that your product was being misappropriated triggers the three-year period. That's correct. And your trade secret goes into the public domain. I'm sorry? Your trade secret there after the three years after the first violation goes into the public domain. You lose your trade secret. I'm not sure if that's the case, Your Honor. Well, you lose your trade secret. Let's put it that way. Well, to the one defendant, to the accused party, possibly. But I can't speculate. I'd be guessing as to whether other parties who try to move in and illicitly try to obtain information, whether there's not a cause of action there. That would be the logical conclusion, though, if there's only a single. I'm not sure of that, Your Honor. I'm not sure. I'm not sure. Be candid with the Court. But I can tell you that the defendant in this case, the epilee in this case, is Eskim. And they knew for nine years what was going on, unmistakably, through the e-mails and otherwise. And in the complaint, they actually said, in the complaint, that Biomet was aware or should have been aware. Everything was brought on information and belief because what they claimed was said in December of 2011 wasn't really said. But they knew. So if Eskim could know about it, if Eskim supposedly knew all this information, then certainly Horaeus would have known about it. Counsel, can you confirm from your own research that the commentary from the Uniform Trade Secrets Act, to the extent that appears in the Pennsylvania annotated statutes, that's not something that was brought in by any Pennsylvania commission or the Pennsylvania legislature. That's actually an Editor Westlaw addition, an administrative addition, as your colleague was terming it. It's my understanding that those comments did not come in from Pennsylvania, from Pennsylvania legislation. Nor should it have needed to come in from Pennsylvania because the discovery rule statute limitations, clearly on its face, has to be enforced under the rules that this Court follows. Again, this will be the very first case ever where repeated cruel occurrences of ongoing infringement would be permitted to restart a Uniform Trade Secret Act case. You haven't pointed us, however, to a case where this issue has been squarely presented under one of the other two state laws where they did delete this sentence. That's true, Your Honor. It hasn't been attacked with that approach, although it was addressed in Webb Diet, which is, you know, a state court case. But the Common Pleas Court there didn't even acknowledge that there was text that was omitted in Pennsylvania's enactment of the statute and focused exclusively on the commentary to the Uniform Act that arguably, in any event, goes to delete a text. There are a lot of theories why it was left out. I thought North Carolina summarized it perfectly. It needs no amplification. And in this particular state, under PUTSA, in this particular circuit, discovery-based statute's limitations are basically construed rigidly, narrowly. And we're just asking for consistency in how it's interpreted here. It's much easier when you're dealing with expressed statutory language, as Sentence 1 gives you, and not try to read tea leaves in determining what was the intent for this, what could have been the intent for that. Frankly, I think it's logical that, as Your Honor has suggested, that if there's something in there that you're uncomfortable with as a legislator, if you're uncomfortable with something, you leave it out. Especially if it all of a sudden affects your other discovery-based statute's limitations. Certainly, this is not the case where there's a nine-year hiatus between first knowing and finally filing suit. This is not the test case that should be the example. My recollection, when you say nine years, what was the knowledge that Herreus acquired nine years before it filed suit? In 2005, it discovered... Are you talking about the action in Germany? No, no. 2005, there was the discovery of the competitive product. And they had an expert come in, test 14 samples, and determine, oh, this could not have been arrived at by Biomed. At that point, it knew that Eschem was misusing or misappropriating intellectual property. They suggested that Eschem was in cooperation with Biomed. It could only have been acquired if it was taken illicitly. That was done in 2005. Now, these parties, Herreus and Biomed, didn't just go their merry ways for three years between 2005 and 2008. There was a lot of fighting that was going on, but it wasn't until 2008 that Herreus brought the German action. In 2009, they brought the 1782 actions. In 2010 and 2011, they got thousands of pages of documents. They got the specifications. They got the certificates of analysis on all the compounds for Eschem. You agree. And so the issue for us is when there was more than just enough for speculation that Eschem had the necessary mental state. Oh, there was a lot more, Your Honor. In fact, like I mentioned previously, there were 32 items. I could go through the appendix citations to them right now with it, but on at least three occasions. And really, if you could, Your Honor, take a look at the complaint that was filed. In 2014, we've got Herreus saying, back in 2005, Eschem should have known. In 2008, they should have known when the German action was filed. 2009, they should have known that they were getting trade secrets. They're going on and on and on about what Eschem should have known, and yet Herreus didn't know. Is it your view that, you know, I still think of this question of knowledge as being a factual issue. Is it your point that there was so much available information that Herreus really knew or clearly should have known that its product was being misused? Of course. That's your view. Absolutely, Your Honor. When, under oath, declarations are filed during the 1782 action that specifically confirm that they've got the smoking gun, they got the bullet, and it all came out of Eschem's documents. Now, all of this was acquired in 2009, 2010, and the beginning of 2011, again, before the crucial date. They represented that they had everything they wanted. They found the stuff. They've got a terrific case now. That's what they represented. I think we're going to be hearing from your colleague as to what was really additional to those emails that were disclosed in the 2009 case. Certainly, Your Honor. And, again, reviewing 1703, APP 1703, those four pages, what they claim is the revelation from that it's not in there, that somehow Eschem should have known it was a trade secret. It's not in there, and it wasn't cited two and a half years later when they filed their complaint. It belies the representation.  Thank you, Your Honor. Counsel, can you point us to where it is in there? Yes, Your Honor. Can I take you briefly, chronologically, to get to the answer? Yes. And, again, we understand some things are under seal and you can treat it with appropriate sensitivity. And we're going to start with, in fact, that very issue. If one looks at 1604, it's one of the emails Your Honor referenced, and I would just ask when you get back to Chambers to look at the bottom of 1604 where there's a representation as to the public or non-public nature of the information being disclosed. And it would suggest, it will actually lead to, let me put it this way, it is contradictory to our understanding of the December 2011 deposition. Now, fast forward to August 2009. Counsel just suggested that for nine years we had to know. Well, in August 2009, in a hearing related to the ESSCAM 1782 action in this district, Horaeus's lawyer said, quote, and this is at 669, we have no reason to believe that ESSCAM is complicit in any misappropriation. We believe at this point in time that ESSCAM only acted on whatever instructions they may have been provided by Biomet with respect to these two copolymers. Sorry, take me back a moment. Who is the author of that comment? What I just read? Yes. That is Horaeus's lawyer in open court. So that is our state of mind of 2009. Now, you may think we were wrong somehow, but this gets back to the fact-bound nature of this inquiry. In 2009, we were saying that in open court. And by the way, no one at ESSCAM jumped up at that point and said, no, no, no, you're wrong. We're on the hook. We're in cahoots. So if you prove trade secret misappropriation against Biomet, you've also proven it against us. They didn't disagree with us. Similarly, in 2011, the summer of 2011, the court said ESSCAM could be a total innocent in this regard. They could be. And then this is at 1669. And then our lawyer, Horaeus's lawyer, said they could be, agreed with the court that they could be a total innocent in the summer of 2011. Whether the district court was aware of the discovery that had been exchanged, or counsel had gotten into the weeds of going through the discovery that had been exchanged, isn't the question for us whether there was discovery before the deposition that gave you the very same storm warnings that should have triggered the running of the statute of limitations? Your Honor, respectfully, that's for the jury, not for the court. Well, you've identified for us specifically what in the deposition was supposedly the revelation that gave you the necessary knowledge. Right. So your adversary has suggested that is actually in documents that were produced in August of 2010 and March of 2011. Your Honor, I don't. What's different? There is no evidence in any of the e-mails pointed to or in any of the testimonies cited, there is no reference to disclosure from Biomet to Eskam of any of the trade secrets that are obviously under seal and not even in the record before this court. So none of the e-mails they point to discuss the trade secrets that are in dispute below. What we now know in December 2011 is they were in the same room at the same time discussing development. And common sense would dictate that although to this point we had no evidence that there was a disclosure of trade secrets from Biomet to Eskam that Eskam was aware of, now that they're sitting in the same room, it defies common sense to suggest that Eskam wouldn't have become aware of it now that we know the intensity of the involvement. But these e-mails have exchanges where they're discussing the specifications for it, how the batches are coming along. Your Honor. How does that not show close collaboration? Why do they need to be physically in the same room when their e-mails indicate that they're working closely together on the details of this development? Your Honor, this is where we're a little hamstrung because those are not the trade secrets that are at issue below. The trade secrets are in some sense one level of specificity down from that. And you may be right that in December 2011 that still might not have been enough to pull the trigger. Maybe we were actually too aggressive or maybe the date was we have additional facts. In 2014 when we filed the complaint, we had learned a lot between December 2011 and 2014. So the Dan Smith deposition, which, you know, to pardon my continuous use of cartoon references, got our spider senses really tingling. We then learned stuff subsequent to that that was even more compelling of Eskam's knowledge. But what you've pointed to and argued on appeal is that deposition and specifically learning from that deposition that they were working closely together on the development of these two polymers.  Respectfully, it was not. It was a level of intensity and concurrent work that we were unaware of before. And maybe it doesn't strike you as a compelling difference, but that is when we became aware. If and when we get to a jury, we will have a witness on a stand that said, that's when we went from suspicion to probable cause. I know that's not the right phrase, but you get the point. What do we do with the fact that your expert has already said something a little different than that? As to Eskam? I believe he said that as to Biomet, and that's kind of where this gets confusing. We were darn certain that Biomet had stolen our trade secrets. It was whether Eskam was, as they were saying in 2011, an innocent supplier to the guilty Biomet, or whether they were in cahoots. That's the distinction that got blurred from time to time in the district court opinion. Well, you don't have to have – the problem is your adversary is saying that what you say they should have, that you should have, is actual knowledge. They say all you need is sufficient suspicion and that all of this going back and forth, anyone in your position should have known that something was amiss. Your Honor. Yes, they didn't know your actual state of mind. They will acknowledge that. But they say that given all this information that's passing by with Biomet and the e-mails and everything, that you have the deaf-dumb and not to know that there's collaboration with the trade secret. Your Honor raises an excellent point, and it goes to the language I read earlier in Banach and Gleason, which is, all right, so you've now been presented with this evidence that a non-deaf-dumb and blind person would recognize raises issues. And what the cases seem to suggest is you have – if you bury your head in the sand, we're going to find that the statute of limitations – we're going to have imputed knowledge. The statute of limitations starts to run. But if instead of burying your head in your stand or filing a lawsuit, what you do is you aggressively seek out further information, which is what we did. We exercised diligence through the 1782 process. It raises an interesting policy issue. Eskam wasn't in repose. They didn't think they were off the hook. They were getting – assuming, you know, for these purposes that they knew they had stolen trade secrets. Well, they knew the jig was soon to be up. This isn't a situation where we were lying in the weeds. It was just a question of when – we're now aggressively going after information. When does the statute trigger? And that, I think, is a factual question. Well, their position is you want to have more than, you know, a reasonable knowledge. You want to have actual state of mind. And that's basically what they say, that there's enough that was putting you on notice here, that you didn't have to know actual knowledge that they were stealing your trade secret. I think that you should have been aware, as a reasonable tradesperson, that this can't be, that something's amiss in the state. A reasonable suspicion might be a good phrase. I'm sorry? A reasonable suspicion might be a good phrase. We were under – I think that at some point, the point where the suspicion became enough that we could act, we believe, was December 2011. Yeah, the deposition. The deposition. Was that at the deposition itself where you had an aha moment and said, yes? That's what our witnesses will – well, not at that exact moment. And there were also issues of protective orders and when certain people could learn of certain things. But that will be the testimony at trial if we get there, that that's when we said this innocence – we just heard four months ago that they could have been innocent bystanders to this. We now know they weren't bystanders. What statement exactly was cited at that position? It was – I oppose you to say at that very moment that our intellectual property is being used or stolen. That the two witnesses, and I'm not sure of the confidentiality status, so I'll just say that the two participants were actually in the room as part of the development team. That was the statement that pushed us. The revelation is that they are physically present as opposed to conferring through other means? As opposed to sporadically interacting. It's not a literal – whether it was a phone call or an email. It was that they weren't just sitting there in Pennsylvania getting emails saying, do this, do that, do this. Especially in light of, Your Honor, the email I read you at 1604 where there had been specific suggestions as to what the public or non-public nature that suddenly became implausible that they were – suddenly is a strong word – where it became increasingly implausible that that line was respected. Given the history before that date, and as you're saying now, you acquired enough information in that deposition to file a claim. You then waited nine months. I mean, I would have thought you would have immediately taken action. Your Honor, that – I was not counsel at the time. I don't know what considerations. There was the backdrop of the German litigation, and until – remember, there was a period of time where in Germany there was found to be no misappropriation by Biomet. And I suspect until that was reversed and it was affirmatively found that there was misappropriation, if we had filed suit in that window of time, we likely would have gotten a Rule 11 motion saying, how can you accuse us, ESCAM, of misappropriation derivatively from Biomet when Biomet has been found innocent in a German court? And that was in that window, and Your Honor, I apologize if this is speculation on my part, but the timing works. I believe that we were not in a position to actually pull the trigger as to ESCAM until the German court confirmed that Biomet had, as a factual matter, taken our trade secrets. Counsel, even if we were to accept that the single approval has a role to play here, we would still be looking at the question whether there were new and independent injuries. Yes, Your Honor. And where there has been an alleged misappropriation of a trade secret, it's put in place at the outset of the manufacturing process, and manufacturing from that point is simply continuing in an automated sort of way. How would you even identify the specific injuries? Is it by date? It's by batch. I mean, it's by batch. And this is closely analogous to the Kuznetsov case. Apologies for the pronunciation. Out of the Western District in 2010. And there it was a paycheck by paycheck. It was almost exactly the same phenomenon, where a policy was put in place that turned out to be unlawful, some of it pre-statute period, some of it after, and the court found that each pay period where the pay was unlawfully low was an independent tort, and so you could get recovery on a paycheck by paycheck basis within the window, but not before the window. If we're going to look to that sort of claim as a model, we also have the Supreme Court's approach to a very similar issue in Ledbetter. Although Congress came in afterwards and enacted a statute that treated lower pay for women differently, the court's analysis in the majority was that you look to the first decision that put that policy in place and that all of the subsequent checks that followed in a sort of automated way were continuous, that they weren't triggering new accrual dates. Why wouldn't that control? Your Honor, I think if you look, the two cases that we've briefed, Kuznetsov and Gordon Breach, both talked about new and independent injury, and there was also a notion in Pennsylvania that I don't believe was in play in Ledbetter, but my recollection is not as strong as Your Honor's, about the uncertainty of each amount. So next year, ESCAM could make five batches. The year after, they could make 20. The year after that, they could make zero. And so sitting here today, we couldn't, unlike Gordon and Breach, which wasn't a misappropriation case but is helpful for the analysis, we can't sit here today, have a damages expert tell us what the remedy would be on a go-forward basis, because each, you know, there could be, and frankly, tomorrow ESCAM could say, we're going to ditch this and we're going to try something else. So I don't think those are, I don't think that undermines our argument is my point. Well, we're not dealing with damages in any of that. Correct, Your Honor. It's neither here nor there. You have to get through the liability issue first before you get the damages. I'm not too sure Landon-Better has any relevance here. It's not dealing with civil rights here. So it might be a different world completely. Your Honor, with respect, I'll take the Fifth Amendment on this particular issue. We'll all do it that same thing. Thank you. With no further questions, I appreciate the court's time, and thank you for counsel. Thanks both counsel for an excellent argument, and we will take the case under revised. Thank you.